**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

WYATT PUCKETT, et al.,       )
                                  )
       Plaintiff(s),       )
                                  )
       vs.            )     Case No. 4:18-cv-02102-SRC
                                  )
SAINT LOUIS COUNTY, MISSOURI,   )
et al.,                        )
                                  )
       Defendant(s).     )

**<u>Memorandum and Order</u>**

St. Louis County police officers, in separate and unrelated incidents, seized the firearms

of Plaintiffs Wyatt Puckett and Robert Pauli, III discovered in plain view during legitimate law-

enforcement activities.  Years later, the guns remain in the possession of the St. Louis County

police.  Plaintiffs filed the present action against St. Louis County and the officers who seized

their guns, pursuant to 42 U.S.C. § 1983, claiming that Defendants' seizure and continued

retention of their property violated their rights under the Fourth Amendment and the Due Process

Clause.  Defendants move for summary judgment on all Plaintiffs' claims.  Doc. 49.  Because the

seizure of Plaintiffs' guns and ammunition was not unreasonable, and because Plaintiffs have not

exhausted the available procedures for return of their property, the Court grants Defendants'

Motion for Summary Judgment.

**I.**     **Facts and background**

     **A.**     **Wyatt Puckett**

In December 2014, St. Louis County police responded to a 911 call at the home of

Plaintiff Wyatt Puckett and his fiancée, Nicole Grzeskowiak.  Grzeskowiak placed the 911 call to

request an ambulance because Puckett had accidentally shot himself.  Puckett owned a .22

1

caliber handgun that, on the night in question, he had loaded for protection.  The parties do not dispute that Puckett was legally authorized to own and possess the gun and ammunition.  He set the loaded gun, which was an older model lacking modern safety features to prevent inadvertent firing, on the couch next to him.  At some point that evening, Puckett stood up from the couch causing the gun to fall to the floor and accidentally discharge, the bullet striking Puckett in the leg and groin area.

In response to Grzeskowiak's 911 call, St. Louis County police officers arrived at the home first to secure the premises for the paramedics.  One of the officers who arrived was P.O. Desree Dickerson.  Grzeskowiak gave Dickerson and her partner permission to enter the home and told them that this was actually the second time Puckett had accidentally shot himself with the .22 caliber handgun.  Before the officers arrived, Grzeskowiak had placed the gun in plain view on top of an entertainment center.  Less than a month prior, the gun discharged when Puckett accidentally dropped it, shooting himself in the left foot.  Both times the gun accidentally discharged, Puckett was at home with Grzeskowiak and their two young children.

The paramedics arrived and checked Puckett's wounds.  After the paramedics determined he was stable enough for transport, Puckett was able to walk out of the house on crutches to the ambulance.  After Puckett departed, Dickerson told Grzeskowiak that she was taking possession of the handgun for "safekeeping."

The parties dispute whether Puckett and Grzeskowiak gave the officers permission to take the gun.  Dickerson has submitted an affidavit averring that Grzeskowiak told her to take the handgun and that Puckett consented when Dickerson told him she was seizing the gun for safekeeping.  Doc. 52-1.  However, Puckett testified in his deposition that the officers never told him they were taking the gun.  Doc. 54-2 at 17.   He further testified that, before he left in the

2

ambulance, he expressly told the officers not to take the gun.  *Id.*  Grzeskowiak denied telling Dickerson to take the gun but admitted that she did not expressly instruct the officers not to take the gun.  Doc. 51-20 at 25:24-26:1.  She testified that Puckett had already told the officers not to take the gun and that "in that situation I didn't know that I had a choice to keep the gun."  *Id.* at 25:12-23.

The parties do not dispute that Dickerson took possession of the .22 caliber handgun and ammunition after Puckett left in the ambulance.  Before leaving with the gun and ammunition, Dickerson gave Grzeskowiak a police information card with her name and contact information, telling Grzeskowiak to call if she or Puckett had any questions about the gun.  Dickerson returned to the precinct, where she packaged the gun along with the ammunition and turned it over to her supervisor.  At the time, it was the policy of the St. Louis County police department to submit to the police crime laboratory all firearms seized for any reason to make sure that the firearm had no evidentiary value and had not been used in a crime.  Pursuant to this policy, an officer with the Property Control Unit came to Dickerson's precinct and took possession of the gun and ammunition, transporting it to Property Control Unit's location in Clayton, Missouri.

Shortly after his gun was seized, Puckett began efforts to recover it.  He first called Dickerson, who told him that the gun was with the Property Control Unit.  Puckett went to the Property Control Unit to attempt to retrieve his gun, but was told that the firearm would be returned to him after it was examined by the crime laboratory.  Puckett was further advised that it might take up to two years for his gun to be tested because of the number of firearms in police possession waiting to be tested.  The crime lab generally tested firearms in the order received.

Upon learning that it could be as long as two years before he could recover his gun, Puckett filed a lawsuit against Dickerson and the County in state court on February 4, 2015.[1]

The crime laboratory actually completed its testing of Puckett's gun on March 3, 2015, three months after Dickerson seized it, determining that it had not been used in any crime. The next day, counsel for the County notified Puckett's attorney by email that the testing was complete and that Puckett could pick up his gun at the Property Control Unit. Puckett's attorney responded by demanding that a police officer deliver the gun to Puckett's residence. *Id.* Counsel for the County sent two additional letters to Puckett's attorney, in March and April 2015, reiterating that Puckett was free to retrieve his gun and ammunition from the Property Control Unit. In the March 2015 letter, counsel for the County advised that Puckett should call ahead to the Property Control Unit to let them know when he was coming. At his deposition, Puckett testified that he later made two additional trips to the Property Control Unit to retrieve his gun but was unable to "catch anyone" to assist him. Doc. 54-2 at 19. Puckett admitted that he did not take the required paperwork or call ahead before going to the Property Control Unit.

**B.      Robert Pauli, III**

In November 2013, the US Postal Inspectors came into possession of a large parcel addressed to 4533 Green Park Road in St. Louis. After a narcotic-trained dog reacted positively to the package, the postal inspectors applied for and obtained a search warrant for the parcel. Inside, they found seven pounds of marijuana. The inspectors contacted St. Louis County Police Detective Shoni Brevik about the package and its contents.

Brevik applied for and obtained a search warrant for 4533 Green Park Road in St. Louis, which is the address of a business called Vac It All. While executing the search, Brevik made

---

[1] Puckett voluntarily dismissed his state court suit on March 14, 2016. *See Wyatt Puckett v. St. Louis County, Mo., et al.*, Case No. 15SL-CC00386 (21st Judicial Circuit, St. Louis County Court).

contact with Robert Pauli, Jr., then the vice president of Vac It All.  Brevik asked Pauli, Jr. if he knew who might have shipped marijuana to Vac It All, and Pauli, Jr. responded that he knew a lot of people were "assuming" it was his son, Robert Pauli, III, because he had previous drug arrests and smokes marijuana.  Doc. 52-4.  Pauli, Jr. told Brevik that he smoked marijuana occasionally and had smoked marijuana with his son in the past.  Finding no additional evidence at the Vac It All premises, Brevik asked Pauli, Jr. for permission to search his residence.  Pauli, Jr. consented and signed a written consent form.

Pauli, Jr. accompanied Brevik and the other police officers to his residence where the officers conducted the consent search.  Pauli, III lived with his parents but was out of town on the date the home was searched.  In the course of their search, the officers found on a coffee table four plastic bags containing a green vegetative substance they believed to be marijuana. Brevik seized the four plastic bags as evidence.  In the upstairs bedroom belonging to Pauli, III, police also found—lying in plain view on the bed—a .223 caliber rifle with a 30-round magazine loaded with ten rounds of ammunition.  Brevik told Pauli, Jr. that she was taking the gun, and seized it along with the magazine and ammunition.

The parties dispute whether Pauli, Jr. consented to Brevik's seizure of the gun.  Brevik has submitted an affidavit averring that Pauli, Jr. told her he did not know his son owned a gun and that he did not want the gun left in his house.  Doc. 52-4.  Brevik testified that she "took the gun for safekeeping at [Pauli, Jr.]'s request that he did not want it in the house."  Doc. 56-2 at 19. However, Pauli, Jr. testified that the police "didn't ask" to take the gun, they "just took [it]." Doc. 56-2 at 8.  Pauli, Jr. further denied ever telling the officers to get the gun out of his house. *Id.* at 9.  He admitted that he never expressly told the officers *not* to take the gun because he "didn't think he was in a position to prevent them" from taking it.  *Id.* at 8.

5

Brevik asked Pauli, Jr. to tell his son to call her when he got back in town.  When Pauli, III returned from out of town, he asked his father about the gun.  Pauli, Jr. told him the St. Louis County police had taken possession of it during a search of the residence.

Brevik took the gun, magazine, and ammunition to the precinct where she packaged them as evidence.  A few days later, an officer with the Property Control Unit picked up the packaged evidence and transported it to the Property Control Unit storage location.  Because Brevik wanted to speak to Pauli, III about the seven pounds of marijuana, she placed an active "wanted" for Pauli, III for possession of a controlled substance.   In January 2014, police arrested Pauli, III based on the active "wanted."  But when Brevik attempted to interview him, Pauli, III invoked his Fifth Amendment rights and chose not to speak to her.  In April 2014, Brevik applied for two warrants with the St. Louis County Prosecutor's Office against Pauli, III—for possession of a controlled substance and possession of a controlled substance for distribution.  The prosecutor refused the warrants.

Pursuant to St. Louis County police policy requiring all seized firearms to be tested to determine whether they have been used in a crime, the crime laboratory tested Pauli, III's gun in July 2015.  After testing, the crime laboratory returned the gun to the Property Control Unit for eventual release to the owner.

Although he knew from at least January 2014 that his gun was in the custody of the St. Louis County police, Pauli, III made no attempt to recover the gun before he filed the present action against Brevik and St. Louis County in November 2018.  On January 4, 2019, a Property Control Unit officer sent Pauli, III a letter advising him that his gun was available to be claimed at the Property Control Unit with proper identification.  Despite this letter, Pauli still has not made any attempt to retrieve the gun from the Property Control Unit.  At his deposition, Pauli, III

6

testified that he understood he could pick up the gun and ammunition at any time "without consequences" but was not interested in doing so.  Doc. 51-16 at 37:12-23.  He further testified that he wanted the Property Control Unit to "hold onto" the gun.  *Id.*

### C.      St. Louis County police policies

At all relevant times, the St. Louis County police had a policy in place called Departmental Special Order 11-334.  Doc. 51-3.  The purpose of Special Order 11-334 is "to inform officers of the procedures to follow when authorizing the release of seized firearm evidence."  *Id.*  The Special Order provides in relevant part:

II.    <u>General</u>

All firearms seized for any reason will be submitted to the Police Crime Laboratory. … Once the Firearm Section has completed examination of the submitted firearm, the firearm will be submitted to the Property Control Unit where it may be released following the below procedures and within the same federal guidelines as required for purchase of a firearm, as indicated on the Firearm Release Form (see attached).

III.    <u>Procedure</u>

…

B.    Firearms may be released under the following circumstances:

1.    If the statute of limitations has expired for the crime which is the basis for the underlying arrest, the officer can request the weapon be released to the owner. The Property Control Unit will have the person receiving the firearm complete the Firearm Release Form and will conduct a record check through the Bureau of Central Police Records, prior to release of the firearm.

…

4.    If the firearm was seized for safekeeping as a result of a concealed carry permit, has no evidentiary value, and is not connected to an underlying arrest, the firearm may be released to the owner if they qualify under federal guidelines as indicated on the Firearm Release Form.

5.    If charges cannot or will not be brought, the weapon will be released under the same manner as III.B.1.

*Id.* The "Firearm Release Form" attached to Special Order 11-334 has blanks for a description of the firearm being released, the signature of the gun owner, identification of the person receiving the firearm, and questions verifying that the person receiving the firearm is eligible to possess a firearm under federal law. *Id.*

## II.    Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  Self-serving, conclusory statements without support are insufficient to defeat summary judgment. *Armour & Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III.     Discussion

Puckett and Pauli, III each assert three claims under 42 U.S.C. § 1983 against St. Louis County and against Dickerson and Brevik, respectively: (1) deprivation of property (firearm) without due process of law; (2) deprivation of property (ammunition) without due process of law; and (3) unreasonable seizure in violation of the Fourth Amendment.  "Public servants may be sued under section 1983 in either their official capacity, their individual capacity, or both." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999).  Plaintiffs' complaint does not specify whether Dickerson and Brevik are sued in their official or individual capacities. *See generally* Doc. 14.  "[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity."  *Johnson*, 172 F.3d at 535.  Because Plaintiffs have not expressly named Dickerson or Brevik in their individual capacities, the Court construes the complaint as suing the officers in their official capacities only. A suit against a public employee in his or her official capacity is merely a suit against the public employer.  *Id.* (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).  Thus, Plaintiffs' claims against Dickerson and Brevik in their official capacities merely duplicate their municipal-liability claims against St. Louis County.

A political subdivision may not generally be held vicariously liable under section 1983 for the unconstitutional acts of its employees.  *Monell v. Dep't of Soc. Servs. Of New York*, 436 U.S. 658, 694 (1978).  A political subdivision may be held liable for the unconstitutional acts of its employees only when those acts implement or execute an unconstitutional policy or custom of the subdivision.  *Id.*; *see also Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) ("policy" is an official policy, a deliberate choice of a guiding principle or procedure made by an

official with authority, "custom" is a persistent, widespread pattern of unconstitutional conduct

of which officials have notice and subsequently react with deliberate indifference or tacit

authorization).  Further, for a municipality to be liable under section 1983, the plaintiff must

prove that the official policy or custom was the "moving force" behind the constitutional

violation.  *Mettler*, 165 F.3d at 1204 (quoting *Monell*, 436 U.S. at 694).

As noted above, Puckett and Pauli, III assert claims under the Due Process Clause and

under the Fourth Amendment's prohibition on unreasonable seizures.  The Court first considers

Plaintiffs' Fourth Amendment claims.

### A.      Fourth Amendment seizure

The Fourth Amendment states, in relevant part, that "[t]he right of the people to be secure

in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not

be violated." U.S. Const. amend. IV.   "[R]easonableness is always the touchstone of Fourth

Amendment analysis."  *Birchfield v. North Dak*ota, 136 S. Ct. 2160, 2186 (2016) (citing

*Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)). "An action is 'reasonable' under the

Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the

circumstances, viewed *objectively*, justify [the] action.'"  *Stuart*, 547 U.S. at 404 (emphasis and

alteration in original) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)).

"It is a 'basic principle of Fourth Amendment law that searches and seizures inside a

home without a warrant are presumptively unreasonable.'"  *Id.* at 403 (quoting *Groh v. Ramirez*,

540 U.S. 551, 559 (2004)).  Importantly, however, an officer's "search or seizure carried out in

an individual's home without a warrant is [not] per se unreasonable [if] it falls within one of the

well-defined exceptions."  *Lesher v. Reed*, 12 F.3d 148, 151 (8th Cir. 1994) (citing *Coolidge v.*

*New Hampshire,* 403 U.S. 443, 474 (1971)).

Consent to search by a person having authority over the property searched is an exception to the warrant requirement. *See, e.g., Fernandez v. California*, 571 U.S. 292, 298 (2014). "Consent searches are part of the standard investigatory techniques of law enforcement agencies and are a constitutionally permissible and wholly legitimate aspect of effective police activity." *Id.* (internal quotation marks omitted) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 231-32 (1973)). When a resident of a searched premises gives voluntary consent to search, a warrantless search of the residence does not violate the Fourth Amendment. *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1003 (8th Cir. 2010).

### 1.      Pauli, III

Pauli, III does not dispute that Brevik received consent to search his parents' residence from a person with authority to give it. His father, Pauli, Jr., gave Brevik both oral and written consent to search the premises. Doc. 56 at 26. Officers discovered Pauli, III's loaded firearm in his bedroom in the course of this consent search. *Id.* at 26-27.

"[A]n officer, without a warrant, may seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating nature is immediately apparent, and the officer has a lawful right of access to the object." *United States v. Bustos–Torres*, 396 F.3d 935, 944 (8th Cir. 2005). "'Immediately apparent' means that the officers have probable cause to associate the object with criminal activity." *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995). Pauli, III argues that, even if Brevik had consent to search the premises, the seizure of his firearm violated his Fourth Amendment rights because the officers lacked probable cause to associate his gun with criminal activity. Doc. 55 at 2. The Court disagrees.

Pauli, III argues that the officers lacked probable cause to associate his gun with criminal activity because Brevik admitted that she seized the gun "only" for safekeeping. Doc. 56-2 at 19. Brevik testified that she took the gun at Pauli, Jr.'s request because he did not want it in the house. *Id.* Whether Pauli, Jr. gave consent to the seizure is a disputed issue of fact, but this does not preclude a finding of probable cause. "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Probable cause "is not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018). At the time the officers seized Pauli, III's gun, they were investigating the seven-pound package of marijuana sent to Vac It All's address. Pauli, Jr. acknowledged that his son, Pauli, III, smoked marijuana and had prior drug arrests. The police found four plastic bags of vegetative substance—suspected to be marijuana—during their search. Brevik eventually pursued drug charges against Pauli, III, though the prosecutor refused the charges. On these facts, a reasonable officer could find probable cause to associate Pauli, III's firearm with criminal activity, i.e., marijuana distribution. *See United States v. Close*, 518 F.3d 617, 620 (8th Cir. 2008) (citing evidence that "firearms are used by drug dealers to protect their money and their drugs from other drug dealers and from police").

Importantly, probable cause is an "objective standard." *Wesby*, 138 S. Ct. at 585 n.2. "'[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'" *Devenpeck*, 543 U.S. at 153 (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)). Thus, whether Brevik subjectively associated Pauli, III's gun with criminal activity at the time of seizure does not determine probable cause. It is enough that circumstances *objectively* justify probable cause, as

12

they do here.  In sum, Brevik had probable cause to associate Pauli, III's gun with criminal

activity, so the warrantless seizure of the gun did not violate Pauli, III's Fourth Amendment

rights.  *Bustos–Torres*, 396 F.3d at 944.

### 2.    Puckett

Dickerson did not have consent to search Puckett's residence, but she did have

Grzeskowiak's permission to enter the home.  Defendants assert that Dickerson had consent from

both Puckett and Grzeskowiak to seize the gun, but Puckett offers evidence disputing that claim.

The Court finds a genuine dispute of fact as to whether Dickerson received consent for the

seizure.

Whether she had consent or not, Defendants argue that Dickerson had probable cause to

seize Puckett's firearm and ammunition.  Doc. 50 at 5.  As discussed above, Dickerson's seizure

of the gun in plain view was valid if she had probable cause to associate the gun with criminal

activity.  *Hatten*, 68 F.3d at 261.  Puckett argues that he legally owned and possessed the gun and

that the incriminating nature of the gun was not immediately apparent, and Dickerson had no

reason to associate the gun with criminal activity.

The Court finds it unnecessary to determine whether Dickerson had probable cause to

associate the gun with criminal activity because another plain-view exception to the warrant

requirement applies here.  "[O]fficers may temporarily protectively seize a handgun in plain

view so long as 'a reasonably prudent [person] in the circumstances would be warranted in the

belief that his [or her] safety or that of others was in danger.'"  *United States v. Lewis*, 864 F.3d

937, 946 (8th Cir. 2017) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).  The Court finds that

Dickerson could reasonably have believed that Puckett's gun—loaded and in plain view in the

home where he was present with Grzeskowiak and their two young children—posed a threat to

her own safety or that of others.  Grzeskowiak informed Dickerson that the gun had already

accidentally discharged twice in the space of a month, wounding Puckett both times, including

the shooting that immediately precipitated the 911 call.  Puckett testified that the gun lacked

modern safety features that prevent inadvertent firing.  On these facts, Dickerson would have

been warranted in her belief that the gun was unreasonably prone to accidental firing and needed

to be secured to make the premises—and the occupants, which included two young children—

safe.  Thus, the Court finds Dickerson's seizure of Puckett's firearm and ammunition did not

violate the Fourth Amendment.

### 3.    *Monell* liability

As discussed above, the Court finds the officers' warrantless seizure of Plaintiffs'

property justified under the Fourth Amendment by plain-view exceptions to the warrant

requirement.  However, in the alternative, the Court finds it unnecessary for purposes of

Defendants' motion for summary judgment to determine whether the officers' initial seizure of

Plaintiffs' property was reasonable under the Fourth Amendment.  Although Plaintiffs contend

that Dickerson and Brevik seized their property without consent or probable cause, they do not

allege—and have presented no evidence—that St. Louis County has an official policy or custom

of allowing police officers to seize property without consent or probable cause.  *See Wellman v.*

*St. Louis Cty.*, 255 F. Supp. 3d 896, 903 (E.D. Mo. 2017).  Because Plaintiffs only assert claims

for municipal liability, their failure to show that the allegedly-unconstitutional seizures were

pursuant to an official policy or custom is fatal to their Fourth Amendment claims.  *Monell*, 436

U.S. at 694 (political subdivision may only be held liable for the unconstitutional acts of its

employees only when those acts implement or execute an unconstitutional policy or custom of

the subdivision).

14

In sum, the Court grants summary judgment for Defendants on Plaintiffs' § 1983 claims for unreasonable seizure under the Fourth Amendment.  The Court now turns to Plaintiffs' Due Process claims.

### B.      Fourteenth Amendment Due Process

The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.  In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court recognized that "procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  *Id.* at 332. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Id*. at 333 (internal quotation marks and citations omitted).  Yet, due process is a flexible concept, requiring only "such procedural protections as the particular situation demands."  *Id.* at 334 (internal quotation marks and citation omitted).  "The circumstances of the deprivation dictate what procedures are necessary to satisfy procedural due process."  *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 818 (8th Cir. 2011) (internal quotation marks and citation omitted). Defendants do not dispute that Plaintiffs' interest in their firearms and ammunition constitutes a valid, constitutionally-protected property interest.  Consequently, the issue is what process Plaintiffs are owed for the deprivation of that property.  *Walters v. Wolf*, 660 F.3d 307, 311 (8th Cir. 2011).

In *Walters*, the Eighth Circuit considered a situation similar to the case at bar.  Police seized the plaintiff's firearm and ammunition when he was stopped for a traffic violation and a records check revealed an active warrant.  *Id.* at 309.  Thereafter, the prosecutor issued felony

charges against the plaintiff for unlawful possession of a firearm, but the circuit court found no probable cause and dismissed the charges. *Id.* Because the plaintiff legally possessed the firearm and had a valid concealed carry permit, the plaintiff's attorney made multiple written demands to the police department demanding that the gun and ammunition be returned, both before and after the circuit court dismissed the charges. *Id.* at 309-10. The police department refused to return the gun because it had a policy requiring a court order before returning a lawfully seized firearm. *Id.* at 310. The plaintiff sued the municipality, asserting, among others, a procedural due process claim. *Id.*

The Eighth Circuit found that the case "actually involve[d] *two* deprivations," the first being the initial seizure of the gun incident to arrest, "and the second being [the police chief's] subsequent and continued refusal to surrender the property following [the circuit court's] dismissal" of the charges. *Id.* at 314. The Court noted that these "two distinct deprivations" constituted "separate Fourteenth Amendment events." *Id.* Likewise, St. Louis County's seizure of Plaintiffs' guns and ammunition also encompasses two distinct deprivations—first the initial seizures, and then the "subsequent and continued" failure to return the property. *Id.* The Court addresses the initial seizures first.

###   A.   Initial seizures

The Court has already determined that Dickerson and Brevik's seizure of Plaintiffs' firearms complied with the Fourth Amendment under plain-view exceptions to the warrant requirement. This means that the initial seizures also met the requirements of procedural due process. In *PPS, Inc. v. Faulkner Cty., Ark.*, 630 F.3d 1098 (8th Cir. 2011), the Eighth Circuit held that "[w]here the plain view doctrine justifies a warrantless seizure for valid law enforcement purposes in a criminal investigation under the Fourth Amendment, any

predeprivation due process protections are necessarily subsumed within the Fourth Amendment analysis." *Id.* at 1107.  Thus, "[w]hen seizing property for criminal investigatory purposes, compliance with the Fourth Amendment satisfies pre-deprivation procedural due process as well." *Id.*  Because the warrantless seizure of Plaintiffs' guns complied with the Fourth Amendment, the initial seizures also necessarily complied with the requirements of procedural due process.

Further, even if the initial seizures did *not* comply with the Fourth Amendment, Plaintiffs nevertheless fail to establish their *Monell* claims for procedural due process as to the initial seizures, for the same reason that their Fourth Amendment claims fail as a matter of law.  *See* Section III.A.3., *supra*.  As noted above, Plaintiffs have presented no evidence that St. Louis County has an official policy or custom of allowing police officers to seize property without consent or probable cause.  Plaintiffs' failure to show that the initial, allegedly-unconstitutional seizures were pursuant to any official policy or custom is fatal to this claim.  *Monell*, 436 U.S. at 694 (political subdivision may only be held liable for the unconstitutional acts of its employees only when those acts implement or execute an unconstitutional policy or custom of the subdivision").

## B.    Continued deprivation

Plaintiffs do contend that an official policy of St. Louis County directly caused the continued deprivation of their property St. Louis.  Plaintiffs offer evidence, and Defendants do not dispute, that the St. Louis County police department has a policy of submitting to the police crime laboratory all firearms seized for any reason to make sure that the firearm has no evidentiary value and has not been used in a crime.  Doc. 54-1 at ¶ 34.   Plaintiffs argue that as a direct result of this official policy, Defendants continued to deprive them of their property is.

17

1.      **Special Order 11-334**

The policy at issue, Special Order 11-334, does not actually require the St. Louis County police to retain seized firearms for any specified amount of time.  Instead, the Special Order provides that "[a]ll firearms seized for any reason will be submitted to the Police Crime Laboratory" for testing.  Doc. 51-3.  The Special Order further provides that seized firearms are not returned to the Property Control Unit for eventual release back to the owner until this testing is complete.  *Id.*  In *Putman v. Unknown Smith*, 98 F.3d 1093 (8th Cir. 1996), the Eighth Circuit held that a jury could reasonably find that the multi-month deprivation of the plaintiff's vehicle was a foreseeable result of St. Louis County's policy of impounding all vehicles in which illegal drugs were found during traffic stops.  *Id.* at 1096.  The jury heard evidence that the County's "zero-tolerance seizure policy" resulted in as many as a thousand calls each week from property owners seeking the return of their seized property, "overwhelm[ing] the county's seizure and forfeiture processes."  *Id.*  Thus, the Eighth Circuit reversed the district court's grant of summary judgment for the County because there was sufficient evidence to conclude the deprivation was a result of the policy, rather than "random and unauthorized."  *Id.*

Plaintiffs allege that Special Order 11-334 resulted in a large backlog of firearms waiting to be tested.  Doc. 14 at ¶ 109.  Firearms are generally tested by the Property Control Unit in the order they are received.  The Property Control Unit initially told Puckett it might take up to two years before testing of his firearm would be complete (even though it actually took far less time).  More than a year elapsed between the seizure of Pauli, III's gun and when the crime laboratory completed testing.  More than four years elapsed before the Property Control Unit notified Pauli, III his gun was available to be retrieved.  In light of *Putman*, the Court assumes for purposes of Defendants' motion for summary judgment that Plaintiffs have presented sufficient evidence to

find that the continued deprivation of their property was a foreseeable result of Special Order 11-334.  Accordingly, the Court finds for purposes of this motion that the continued deprivation of Plaintiffs' property was pursuant to official policy of St. Louis County.

### 2. *Walters v. Wolf*

In *Walters*, the Eighth Circuit addressed the requirements of due process when government officials deprive a person of property pursuant to an official policy or procedure. 660 F.3d at 311-14.  Although "the Supreme Court usually has held that the Constitution requires some kind of hearing *before* the State deprives a person of liberty or property," the Eighth Circuit noted that "in some circumstances…a postdeprivation hearing or a common-law tort remedy for erroneous deprivation, satisfies due process."  *Id.* at 312.  The Court distinguished between deprivations caused by "a random and unauthorized act by a state employee" and those caused by "some established state procedure."  *Id.*  In the former case, a post-deprivation hearing may be adequate.  *Id.* at 313.  But where the deprivation is pursuant to official policy or procedure, "postdeprivation remedies generally fail to satisfy [due process]."  *Id.*

Applying these principles, the Eighth Circuit in *Walters* reversed the district court's grant of summary judgment for the defendant municipality on the plaintiff's procedural due process claim.  *Id.* at 315.  As noted above, the police department refused to return the plaintiff's gun and ammunition even after the state court dismissed the charges against him.  *Id.* at 313.  The parties agreed that "defendants' retention of the firearm and ammunition were undertaken pursuant to an established policy rather than an unauthorized or random act."  *Id.* at 313.  Accordingly, even though the initial seizure of plaintiff's property was valid, the municipality's "continued refusal" to return the gun and ammunition after the state court dismissed charges was a "constitutionally impermissible deprivation" for which "relegation to a post-hoc state tort action to address the

19

deprivation [was] inherently insufficient." *Id.* at 315.  Plaintiffs argue that the Eighth Circuit's decision in *Walters* applies here and precludes summary judgment.  The Court disagrees.

### 3.      *Mickelson v. County of Ramsey*

In *Mickelson v. County of Ramsey*, 823 F.3d 918 (8th Cir. 2016), the Eighth Circuit revisited and clarified the scope of *Walters*.  *Mickelson* involved a section 1983 procedural due process claim brought by arrestees against a county that maintained a policy of collecting a $25 booking fee from every individual arrested and booked at the county jail.  823 F.3d at 921-22. Under the policy, arrestees not charged or later acquitted were eligible to receive a refund of the booking fee by completing and submitting a refund form.  *Id.* at 922.  Citing *Walters*, the plaintiffs argued that "only a pre-deprivation hearing can satisfy due process" when a deprivation occurs pursuant to an established state policy.  *Id.* at 927-28.

The Eighth Circuit rejected plaintiffs' "broad assertion" as "inconsistent with the Supreme Court's holding in *Matthews* that 'something less than an evidentiary hearing' may be 'sufficient prior to adverse ... action,' even when the deprivation imposes a 'significant' hardship." *Id.* at 928 (quoting *Matthews*, 424 U.S. at 342-43).  The Court noted that the holding in *Walters* "turned on the inherently 'lengthy and speculative' nature of post-deprivation remedy available—an action in tort." *Id.* at 928.  Further, the Court stated that "post-deprivation administrative remedies are innately distinguishable." *Id.*  Thus, the Court concluded: "We do not read *Walters* to foreclose the possibility that an adequate post-deprivation process may satisfy the Fourteenth Amendment…." *Id.*  Accordingly, under *Mickelson*, as long as a constitutionally-adequate post-deprivation process exists, due process is satisfied—even when the deprivation is pursuant to official policy. *Id.* at 928-29.

*Mickelson* sets out at least three principles particularly relevant to the present case. First, the Eighth Circuit in *Mickelson* found no due process violation in the county jail's official procedure even though arrestees who were later acquitted had to surrender their property, i.e., the $25 booking fee, without any pre-deprivation hearing and, potentially, for a significant amount of time. *Id.* at 927. Second, the Court held that a post-deprivation remedy in the form of an administrative "refund form" to recover property could, on appropriate facts, satisfy due process. *Id.* at 929. And finally, the Eighth Circuit held that where such an administrative remedy was available, failure by the plaintiffs to exhaust the administrative remedy precluded any challenge that the remedy was constitutionally inadequate. *Id.* at 929-30.

After *Mickelson*, this Court has, on at least two occasions, found no due process violation where a Missouri political subdivision continued to retain the plaintiff's firearm pursuant to official policy. *See Thiel v. Korte*, No. 2:16 CV 73 CDP, 2019 WL 1275102, at *13 (E.D. Mo. Mar. 20, 2019), *aff'd*, 954 F.3d 1125 (8th Cir. 2020); *and Wellman*, 255 F. Supp. 3d at 907, *aff'd sub nom. Wellman v. City of Jennings, Missouri*, 732 F. App'x 493 (8th Cir. 2018); *but see Lovins v. Korte*, No. 2:16-CV-00038-PLC, 2019 WL 183973, at *15 (E.D. Mo. Jan. 14, 2019) (denying summary judgment based on *Walters* but not addressing *Mickelson*). The *Wellman* case involved a different provision of Special Order 11-334—the very policy at issue here. *See* 255 F. Supp. at 900. In relevant part, the policy provided that St. Louis County would only authorize return of firearms seized "following a suicide intervention" if the owner provided a writ of replevin from state court or a notarized statement from a psychiatrist or psychologist averring that the owner is no danger to himself or others. *Id.* at 900-01. The St. Louis County police had seized the plaintiff's firearm upon suspicion that he was a suicide risk. *Id.* Although he was aware of the policy, the plaintiff refused to comply with its requirements because he

believed it unconstitutional.  *Id.* at 901.  The district court found that the policy gave plaintiff "a meaningful and relatively-nonburdensome way to challenge the deprivation and retrieve his property."  *Id.* at 907.  Because plaintiff failed to exhaust the available remedy, his procedural due process claim failed as a matter of law.  *Id.*

In *Thiel*, the plaintiff alleged violation of his due process rights when the police seized his firearm and other property and did not return it for over four years, even though no charges were ever brought against him.  2019 WL 183973, at *2-3.  The defendant sheriff's continued retention of the property was pursuant to official policy, which only provided for release of property at the sheriff's behest.  *Id.* at *12.  There was no "mechanism under the policy by which the property owner [could] seek redress for the continued retention of property or even start the process."  *Id.*  Although the district court found the remedy provided in the policy inadequate, "the inadequacy of the sheriff's post-deprivation policy [did] not end the inquiry" because "Missouri provides another process by which a property owner may seek to recover seized property."  *Id.*

> Under Mo. Rev. Stat. § 542.301, a person claiming the right to possession of property that is in the custody of an officer as the result of any seizure and which has not been forfeited pursuant to any other provisions of law may file a motion in court praying that the court declare the property not subject to forfeiture and order it delivered to the moving party.  Mo. Rev. Stat. § 542.301.2.  The statute provides that, upon a claimant's filing of such a motion, all interested persons – including the moving party – are provided notice and given an opportunity to appear at a hearing and be heard on the person's claim to the property.

*Id.*  Finding the statutory procedure set forth in Mo. Rev. Stat. § 542.301, a "constitutionally adequate process by which a person may pursue claims of ownership and right to possession of seized property in Missouri," the Court concluded that the plaintiff's failure to exhaust this remedy entitled the defendants to summary judgment.  *Id.* at *13.  The Eighth Circuit affirmed

22

this Court's grant of summary judgment in both *Wellman* and *Thiel*.  *See* 954 F.3d at 1130; 732 F. App'x at 494.

Turning to the present case, the Court finds Defendants entitled to summary judgment on Puckett and Pauli, III's procedural due process claims because Plaintiffs failed to exhaust the available process.

### 4.    Exhaustion of available process – Puckett

The Court finds Puckett did not avail himself of the available process for return of his firearm.  Special Order 11-334 provides that "[o]nce the [crime laboratory] has completed the examination of the submitted firearm, the firearm will be forwarded to the Property Control Unit where it may be released following the below procedures and within the same federal guidelines as required for purchase of a firearm, as indicated on the Firearm Release Form."  Doc. 51-3. The Special Order further provides: "[T]he Property Control Unit will have the person receiving the firearm complete the Firearm Release Form and conduct a record check through the Bureau of Police Records, prior to the release of the firearm."  *Id.*

Puckett testified that he went to the Property Control Unit on three occasions to retrieve his gun.  The first instance occurred before the crime laboratory completed testing of his firearm. Thus, on Puckett's first visit to the Property Control Unit, he was not yet eligible for return of his property under the policy.  *See* Doc. 51-3.  Puckett was unable to retrieve his gun on that trip. This does mean the process was inadequate.  In *Mickelson*, the Eighth Circuit found that the post-deprivation refund process could satisfy due process even though arrestees were not eligible for refund until they were acquitted or had charges dismissed.  *Mickelson*, 823 F.3d at 929. Here, the crime laboratory completed testing of Puckett's gun just three months after Dickerson seized it.

The day after the crime laboratory completed testing of Puckett's gun, the County notified him, via counsel, that he could retrieve his gun and ammunition from the Property Control Unit.  Doc. 51-6.  The County's attorney also advised Puckett to call ahead to the Property Control Unit to ensure someone was there to help him when he arrived.  Doc. 51-7. After receiving these communications, Puckett made two additional trips to the Property Control Unit.  Doc. 51-19 at 76:12-14.  However, he did not call ahead as directed and did not bring the paperwork required by Special Order 11-334 for release of his firearm.  *Id.* at 76:20-77:8. Puckett testified he was unable to "catch anyone" at the Property Control Unit to help him.  *Id.* at 76:12-19.

On these facts, the Court finds that Puckett did not exhaust the process available to him under Special Order 11-334.  That order requires submission of the Firearm Release Form to retrieve a seized firearm.  Doc. 51-3.  Puckett admits that he did not bring this Form or submit it to the Property Control Unit.  In *Wellman*, this Court determined that Special Order 11-334's requirement of a notarized statement from a psychiatrist or psychologist to return a firearm seized on suspicion of suicide risk was a "meaningful and relatively non-burdensome way [for the plaintiff] to challenge the deprivation and retrieve his property."  255 F. Supp. 3d at 907. The Special Order's requirement that Puckett submit the Firearm Release Form to the Property Control Unit is even less burdensome.  Because Puckett did not exhaust the available process, he may not now challenge the adequacy of that process. *Mickelson*, 823 F.3d at 930. ("Absent his exhaustion of the available process, we cannot know whether the current system would fail to yield a return of [his property].").

**5.      Exhaustion of available process – Pauli, III**

24

Pauli, III also did not exhaust the process available to him under Special Order 11-334. Pauli, III argues he did not have adequate notice because Brevik did not leave a receipt or directly inform him that his property had been seized. But Pauli, III knew from at least January 2014 that his gun was in the custody of the St. Louis County police, yet he made no effort to recover the gun until he filed the present action against Brevik and St. Louis County in November 2018. In January 2019, a Property Control Unit officer sent Pauli, III a letter advising him that his gun was available to be claimed at the Property Control Unit with proper identification. Even after receiving this letter, Pauli still made no attempt to retrieve his property from the Property Control Unit. In fact, Pauli, III testified at his deposition that he understood he could pick up the gun and ammunition at any time "without consequences" but was not interested in doing so. Doc. 51-16 at 37:12-23. He further testified that he wanted the Property Control Unit to "hold onto" the gun.[2] *Id.* On these facts, the Court finds that Pauli, III did not exhaust the process available to him under Special Order 11-334.

### 3.   Statutory remedy

Finally, the Court finds that, even if the process available to Plaintiffs under Special Order 11-334 was inadequate—for lack of notice or otherwise—Plaintiffs' procedural due process claims would *still* fail for failure to exhaust a constitutionally-adequate statutory remedy. As this Court recently found in *Thiel*, "[u]nder Mo. Rev. Stat. § 542.301, a person claiming the right to possession of property that is in the custody of an officer as the result of any seizure and which has not been forfeited pursuant to any other provisions of law may file a motion in court praying that the court declare the property not subject to forfeiture and order it delivered to the

---

[2] In the Court's view, Pauli, III's admission that he wants Defendants to keep possession of the gun raises questions of mootness. But since the parties have not briefed the issue, and because it is unnecessary to the Court's summary judgment ruling, the Court does not reach this issue.

moving party."  2019 WL 1275102 at *12.  This statutory procedure is a "constitutionally adequate process by which a person may pursue claims of ownership and right to possession of seized property in Missouri."  *Id.*  Importantly, "[n]o individualized notice of this process is required, given that it is established by a published, generally available state statute and case law."  *Id.* (citing *City of W. Covina v. Perkins*, 525 U.S. 234, 241 (1999) ("Once the property owner is informed that his property has been seized, he can turn to these public sources to learn about the remedial procedures available to him.")).

Neither Puckett nor Pauli, III invoked the statutory procedure available to them under Mo. Rev. Stat. § 542.301.  In view of Plaintiffs' inability to demonstrate any inadequacies in the statutory process because of their failure to use it, their due process claims fail as a matter of law. *Id.* at *13; *Wellman*, 255 F. Supp. 3d at 908.

## IV.    Conclusion

Accordingly, for all the reasons set out in this Memorandum and Order, the Court grants [49] Defendants' Motion for Summary Judgment.  The Court dismisses with prejudice Plaintiff Wyatt Puckett's claims brought under 42 U.S.C. § 1983 and raised in Counts 1-3 of the Second Amended Complaint.  The Court also dismisses with prejudice Plaintiff Robert Pauli, III's claims brought under 42 U.S.C. § 1983 and raised in Counts 4-6 of the Second Amended Complaint.

So Ordered this 8th day of January 2021.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**

26